**Richard Wallace GRUBE, et al.**

v.

**BETHLEHEM AREA SCHOOL DISTRICT.**

Civ. A. No. 82–3915.

United States District Court, E.D. Pennsylvania.

Oct. 6, 1982.

Bohdan J. Zelechiwsky, Bethlehem, Pa., for plaintiffs.

Thomas J. Maloney, Bethlehem, Pa., for defendant.

FINDINGS OF FACT, DISCUSSION, CONCLUSIONS OF LAW, AND ORDER

HUYETT, District Judge.

Following a hearing on plaintiffs' motion for a preliminary injunction, I make these

findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

1. The plaintiffs are Richard William Grube (Richard), a minor, and his father, Richard Wallace Grube (Mr. Grube), and his step-mother, Linda Grube. (Complaint)

2. The student is enrolled in his senior year at Freedom High School in the Bethlehem Area School District (School District). (Stipulation ¶ 2)

3. The defendant Bethlehem Area School District is the recipient of federal funds, and meets the definition of recipient as defined under 29 U.S.C. § 794 also known as § 504 of the Rehabilitation Act of 1973. (Stipulation ¶ 1)

4. Richard is a vigorous, athletically inclined high school student whose only physical problem is the absence of his right kidney which was removed when he was 2 years of age as a result of a congenital malformation. (Stipulation ¶ 3)

5. The kidney which was removed was a non-functioning unit and had been so since birth. (Testimony of Mr. Grube)

6. Richard's remaining kidney is healthy and fully compensates for the one he lost. (Testimony of Dr. Moyer)

7. Richard has participated in football since the age of eight. He has also engaged in other athletics such as skiing, tennis, baseball and wrestling. (Testimony of Mr. Grube; Richard)

8. Richard has played football as a member of his school's team in ninth, tenth, and eleventh grades. (Testimony of Richard; Stipulation ¶ 4)

9. Richard has also been a member of his school's wrestling team. (Testimony of Richard)

10. Richard was selected to be a member of his school's varsity football team for this year. He was awarded first string positions with the offensive and defensive squads. (Testimony of Mr. Grube; Richard)

11. Richard prepared this summer to participate in the team. He attended team work-outs. He joined in pre-season team exercises which included physical contact. (Testimony of Mr. Grube; Richard)

12. A few days before the first scrimmage, Richard was informed that he had been declared ineligible for the team by the Superintendent of Schools because he lacks one kidney. (Testimony of Mr. Grube; Richard; Dr. LaFrankin; Stipulation ¶ 5)

13. Richard is qualified by virtue of athletic ability to play on his school's varsity football team. (Testimony of Mr. Grube; Richard; Mr. Villani; Dr. LaFrankin)

14. Richard was barred from the football team solely as a result of his lack of one kidney. (Testimony of Dr. Delp; Dr. LaFrankin)

15. In order for Richard to play football, there is no affirmative action required on behalf of the defendant school district regarding any modification of the rules and regulations of the game or the need for the defendant school district to purchase any special equipment for Richard. (Stipulation ¶ 10)

16. No substantial adjustments will be necessitated to the existing football program by the defendant school district should Richard play football. (Stipulation ¶ 11)

17. Richard's participation as a member of the team will not lower the standards of the team as a whole in relationship to the other schools against whom they play. (Stipulation ¶ 12)

18. Richard's handicap would not impede other players' participation in football. (Stipulation ¶ 13)

19. Richard's prior participation in interscholastic football while a student at Freedom High School did not necessitate any adjustment to the game of football or of the training of the participating students. (Stipulation ¶ 21)

20. Richard and Mr. Grube have agreed to sign a written release accepting all legal and financial responsibility in the event of a football injury. (Stipulation ¶ 8)

21. In the second to last or third to last game of the 1981 season, Richard experienced a minor injury to his kidney. (Testimony of Mr. Grube; Richard; Dr. Moyer)

22. The injury occurred when Richard rolled over the helmet of another player. He was unaware of the injury until after the game when blood appeared in his urine. (Testimony of Richard)

23. Richard was admitted to the hospital overnight for observation only. The condition remedied itself without medical intervention. (Testimony of Mr. Grube; Richard)

24. During his hospitalization, Richard was attended by a Dr. Lennart, a specialist in urology. Dr. Lennart did not advise Richard to give up football. He stated that it was up to Richard to decide. (Testimony of Richard)

25. Since it was Richard's decision to continue to participate in football, Dr. Lennart referred him to Lehigh University to secure appropriate protective equipment. (Testimony of Richard)

26. Working with members of the athletic department at Lehigh University and a manufacturer of protective equipment in Texas, Richard obtained a protective "flack jacket" specially designed to protect the ribs and kidneys during football at a cost of $400. (Testimony of Mr. Grube; Richard; Dr. Moyer; Stipulation ¶ 6)

27. Richard has worn this protective device each time he has practiced with the team during the summer training of the 1982 football season. (Stipulation ¶ 7)

28. After the injury in the 1981 season, Richard sat out the few remaining games. This was the result of a decision of the coaches, and not a medical decision. (Testimony of Mr. Grube)

29. Dr. Delp is an osteopathic physician. For 12 years he has held the part-time position of school physician at Freedom High School in addition to his regular practice. In his capacity as school physician, he is the physician for the school's athletic teams. (Testimony of Dr. Delp)

30. Each year, Dr. Delp conducts a medical examination of team members. He sees approximately 100 students in a one or two day period during which he checks heart, lungs, ears, and nose. This year, during this cursory examination, Dr. Delp decided that Richard should be asked for a note from his "kidney physician" permitting him to play football. (Testimony of Dr. Delp)

31. Dr. Delp is not a specialist in urology or sports medicine. (Testimony of Dr. Delp)

32. Richard is not under regular care by a "kidney physician." He contacted Dr. Lennart who attended him during his hospitalization the year before to obtain the note required by Dr. Delp. (Testimony of Richard; Mr. Grube)

33. Dr. Lennart wrote three letters relating to Richard. Each is addressed "To Whom It May Concern." The letters are consistent in concluding that the student is in good general health; that the injury quickly corrected itself, and that his remaining kidney is healthy. (Ex. P4, P3, D1)

34. The first letter dated July 15, 1982 states that it is not Dr. Lennart's recommendation that Richard continue to engage in "physical activities which may jeopardize his physical condition." The letter goes on to say that if the student intends to continue contact sports, protective equipment has been recommended for him. (Ex. 4)

35. The second letter dated August 16, 1982 contains the following language: "Mr. Grube and his son have made a personal decision regarding his participation in athletics. This is not a medical opinion. Richard is free to lead a normal existence of his choice." The second letter makes no reference to risk or hazard from physical activity. (Ex. P-3)

36. The third letter is dated August 23, 1982. It contains the following language: "Richard and his father have been advised that participation in contact sports was deemed hazardous and not recommended under these circumstances." There is no further discussion of risk or hazard. (Ex. D-1)

37. Based upon the language in Dr. Lennart's last letter, a telephone conversation with Dr. Lennart, a consultation with another school physician in the school district, Dr. Delp recommended that Richard be barred from playing football. (Testimony of Dr. Delp)

38. The other school physician contacted, Dr. Hemmerlie, is not a specialist in urology or sports medicine. (Testimony of Dr. Delp)

39. Dr. Delp conducted no medical research relating to the alleged risk to Richard of playing football. (Testimony of Dr. Delp)

40. Dr. Delp's relevant clinical experience is as follows: in 12 years as a school and team physician he knows of no case where a football injury resulted in permanent kidney injury or excision of a kidney. Dr. Hemmerlie's experience was comparable. There was no evidence that Dr. Lennart informed them of such case histories. (Testimony of Dr. Delp)

41. Dr. Delp is not familiar with the protective equipment used by the student. (Testimony of Dr. Delp)

42. Without any research or clinical foundation, Dr. Delp concluded it was "highly risky" for Richard to participate in football. The risk was not specifically identified to Richard or his father. Dr. Delp now maintains that there is a risk of deceleration injury. (Testimony of Dr. Delp)

43. Dr. Moyer is a medical doctor who is board certified in orthopedic surgery. He is the director of the well-respected Sports Medicine Clinic at Temple University. (Testimony of Dr. Moyer)

44. Dr. Moyer examined Richard in preparation for his testimony at the preliminary injunction hearing. He concluded that Richard is in good general health and that his remaining kidney is healthy. (Testimony of Dr. Moyer)

45. Dr. Moyer is familiar with the protective equipment used by Richard. In his opinion, this equipment virtually eliminates any danger of injury from a direct blow to the kidney. Further, in his opinion, there is no injury likely to result to the kidney from deceleration. (Testimony of Dr. Moyer)

46. Dr. Moyer has treated other individuals who lack a kidney and play football. Dr. Moyer treats members of all area professional teams. His associates at the Sports Medicine Clinic whom he consulted with regard to Richard have 20 years of experience in treating members of all area football teams. Dr. Moyer knows of no football injury that has caused significant, permanent damage to a kidney or resulted in excision of a kidney. (Testimony of Dr. Moyer)

47. Dr. Moyer researched the instances of kidney damage from football. He discovered no patients with significant kidney damage from football. There are none who had to have a kidney removed. (Testimony of Dr. Moyer)

48. In Dr. Moyer's professional opinion, Richard can safely play football. The risk of catastrophic injury to his remaining kidney is minute, almost nil. (Testimony of Dr. Moyer)

49. In the extremely unlikely event of a catastrophic injury, Richard's options would be dialysis or kidney transplant. (Testimony of Dr. Moyer)

50. In Dr. Moyer's opinion, Dr. Lennart's statement in his last letter relating to an alleged hazard to Richard and Dr. Delp's and Dr. Hemmerlie's recommendations based thereon, are emotional and not medical judgments. (Testimony of Dr. Moyer)

51. Richard has demonstrated diligence and responsibility in his pursuit of athletic achievement by training on his own as well as part of the team. (Testimony of Richard; Mr. Grube)

52. Richard has demonstrated his reliability by assisting in the care of younger family members. (Testimony of Mr. Grube)

53. Richard has demonstrated responsibility by part-time employment to pay his expenses including the cost of the protective equipment he uses to play football. (Testimony of Richard; Mr. Grube)

54. Richard's mother and father consider him a mature individual. (Testimony of Mr. Grube; Mrs. Williams)

55. Richard is 17 years old and will reach the age of majority in 7 months. (Testimony of Richard)

56. Richard knows that in the event that he loses the use of his remaining kidney, he would have to depend on dialysis. He knows two persons who are on dialysis. He has discussed with at least one of them what dialysis entails. He understands the catastrophic consequences of the loss of his remaining kidney. (Testimony of Richard)

57. Richard is a mature individual. He is well-informed regarding his condition and the consequences of the loss of his remaining kidney. He is capable of making a rational judgment with respect to whether to play football. (Testimony of Richard; Findings of Fact 51–56)

58. In playing football, there are other serious life threatening injuries which may equally befall Richard or any other member of the team. (Stipulation ¶ 15)

59. There are less than seven games remaining in the team's schedule for this season. (Testimony of Mr. Grube; Richard)

60. Richard is a collegiate caliber athlete. (Testimony of Mr. Grube)

61. Mr. Grube supports himself, four children and his wife on a salary of less than $400 per week. The combined balance of the Grubes' checking and savings accounts is less than $400. The Grubes' home was purchased in 1979 for $59,000 and has a first mortgage lien with a principal balance of approximately $58,000. The Grubes' have no other substantial assets. (Testimony of Mr. Grube; Stipulation of counsel at trial)

*Discussion*

Before me is plaintiffs' request for a preliminary injunction. In order to prevail, the plaintiffs must show a strong likelihood of success on the merits, that immediate, irreparable harm will result if the preliminary injunction does not issue, that the grant of the injunction will not substantially harm other parties, and that the public interest favors granting the injunction.

*A.O. Smith Corp. v. F.T.C.,* 530 F.2d 515 (3d Cir.1976).

The plaintiffs' complaint presents two legal theories. First, they assert that Richard has been discriminated against in violation of the Rehabilitation Act of 1973 (Act) § 504. 29 U.S.C.A. § 706(7) (Supp.1981). Secondly, they assert that he has been deprived of his fourteenth amendment right to equal protection giving rise to an action under 42 U.S.C. § 1983. At the preliminary injunction hearing, plaintiffs acknowledged that they rely primarily upon the Rehabilitation Act. I turn to the law applicable to a claim of discrimination under the Act and consider whether plaintiffs have shown a likelihood of success on the merits of this claim.

Section 504 of the Act as amended provides: "No otherwise qualified handicapped individual in the United States ... shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ...." 29 U.S.C.A. § 794 (Supp.1981). In interpreting this section, the Supreme Court has held that an "otherwise qualified" person "is one who is able to meet all of a program's requirements in spite of his handicap." *Southeastern Community College v. Davis,* 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979). The Court interpreted § 504 as follows:

> Section 504 by its terms does not compel educational institutions to disregard the disabilities of handicapped individuals or to make substantial modifications in their programs to allow disabled persons to participate. Instead, it requires only that an "otherwise qualified handicapped individual" not be excluded from participation in a federally funded program "solely by reason of his handicap," indicating only that mere possession of a handicap is not a permissible ground for assuming an inability to function in a particular context.

*Id.* 442 U.S. at 405, 99 S.Ct. at 2366.

Three lower courts have addressed the import of § 504 in contexts similar to the

present case. In *Kampmeier v. Nyquist,* 553 F.2d 296 (2d Cir.1977), the Court of Appeals for the Second Circuit considered an appeal from the denial of a preliminary injunction sought on behalf of children with one eye who were barred from participation in their school's contact sports programs. The school's decision to bar the children was based upon the opinion of the school physician. The medical evidence the children introduced to refute the school physician's opinion was equivocal. Referring to the school's reliance on the opinion of the school physician, the court stated: "The plaintiffs have presented little evidence—medical, statistical or otherwise—which would cast doubt on the substantiality of this rationale." Noting that the equities in the case were very close, the court concluded that this absence of evidence was fatal to plaintiffs' claim. On the evidence presented, it could not be said that the school district lacked "substantial justification" for its action.

In *Poole v. South Plainfield Board of Education,* 490 F.Supp. 948 (D.N.J.1980), the plaintiff was a high school student with one kidney who was barred from his school's wrestling team. Before the court were the defendant's motions to dismiss for lack of subject matter jurisdiction and in the alternative, for judgment on the pleadings. The court denied both motions because on the facts as assumed in the opinion, the plaintiff had demonstrated a right to recovery. The school system's medical director advised the system that it was inadvisable to permit a student with one kidney to participate in contact sports. The student refuted this opinion with medical opinions by his own experts. It was apparent to the court that both the school system physician and the Board itself were making a philosophical and not a medical judgment. The court stated:

> [T]he Board of Education decided that it was part of its function to protect its students against rational judgments reached by themselves and their parents. In effect, the Board's decision stands the doctrine of *in loco parentis* on its head. Traditionally, this doctrine has meant

that a school system must act "in place of the parent" when the parents are absent. *Id.* at 954. Finally, the court observed:

> It is undoubtedly true that injury to Richard's kidney would have grave consequences, but so might other injuries that might befall him or any other member of the wrestling team. Hardly a year goes by that there is not a least one instance of the tragic death of a healthy youth as a result of competitive sports activity. Life has risks. The purpose of § 504, however, is to permit handicapped individuals to live life as fully as they are able, without paternalistic authorities deciding that certain activities are too risky for them.

*Id.* at 953–54.

The final case dealing with similar facts is *Wright v. Columbia University,* 520 F.Supp. 789 (E.D.Pa.1981). In *Wright,* the court heard plaintiff's request for a temporary restraining order in an adversial hearing. The plaintiff who had only one eye had been barred by the defendant from playing collegiate football. The plaintiff presented evidence from a highly qualified ophthalmologist that no substantial risk of serious eye injury related to football exists. The *Wright* court concluded that this testimony distinguished the case before it from *Kampmeier* where the plaintiffs offered "little evidence." Like the *Poole* court, the court in *Wright* concluded that the defendant was motivated by good intentioned, but impermissible "paternalistic" thinking.

Turning to the present case, I begin with reluctance an analysis which compels me to disturb a well-intended decision of local school authorities. The administration of our public schools is a matter almost always better left in the hands of members of the community which the schools serve. Had the plaintiffs relied solely on a conclusory equal protection challenge to the school district's decision, the result I now reach may very well have been different. However, in this case, I am bound to uphold an act of Congress which is specifically designed to protect Richard and the right he is asserting.

The school district has advanced two reasons as "substantial justification" for its action. First, according to Dr. LaFrankin was his concern for the liability that might be imposed upon the school district if Richard loses the use of his kidney. This concern may be answered by the releases which the parents and son have offered to execute. However, the real issue is whether the risk of injury is significant enough to make this concern any justification for the district's decision. Since the existence of a risk is also an issue under the district's second justification, I will resolve these issues together. The district's second justification for precluding Richard from participating in football is concern for his health, safety, and welfare. This concern is based on a risk perceived by the district that Richard could lose his one functioning kidney.

This case began when Dr. Delp decided that it would be helpful to get an opinion from Richard's kidney physician with regard to his ability to play. From this I conclude that Dr. Delp did not consider himself qualified to make that determination. At least, he did not hold an opinion concerning Richard's playing. The letters that were produced from Dr. Lennart were equivocal. His letter of August 16, 1982 is the most enlightening. He recognized in that letter that the decision whether or not Richard should play is not properly the subject of a *medical* opinion. The evidence is clear that neither Dr. Lennart, Dr. Delp, nor Dr. Hemmerlie had any facts which would permit them to make a rational medical evaluation of the existence of a risk. In an understandable abundance of caution, all three eventually concluded that the safest course was to say that Richard could not play. I conclude that the opinion of these three doctors cannot serve as substantial justification for the district's actions where their decision lacks a medical basis.

Even if the letter signed by Dr. Delp and Dr. Hemmerlie could be construed as substantial justification at the time it was received, it is not justification for the continued refusal of the district to permit Richard to play in light of Dr. Moyer's opinion. Dr. Moyer has the clinical experience and has performed the research required to come to a medical evaluation of the risk to Richard. His conclusion was that the risk of injury to the kidney is so slim that there is no medical reason why Richard cannot play football. Essentially, his testimony is consistent with that portion of Dr. Lennart's correspondence which concluded that whether Richard should engage in contact sports is not a medical issue.

Richard's selection for the team established that he is otherwise qualified to play football. For the reasons stated above, the defendant's decision to preclude him from playing lacks substantial justification. Accordingly, I conclude that the plaintiffs have made a strong showing of likelihood of success on the merits.

I also conclude that the plaintiffs have demonstrated irreparable harm to them if relief is not granted *pendente lite.* Our court of appeals has said that the word "irreparable" in this context means

> "that which cannot be repaired, retrieved, put down again, atoned for .... Grass that is cut down cannot be made to grow again; but the injury can be adequately attoned for in money. The result of the cases fixes this to be the rule: the injury must be of a peculiar nature, so that compensation in money cannot atone for it ...." ... "Irreparable injury is suffered where monetary damages are difficult to ascertain or are inadequate."

*A.O. Smith Corp. v. F.T.C.,* 530 F.2d 515 (3d Cir.1976) (citations omitted).

On facts similar to ours, the courts in *Kampmeier* and *Wright* believed irreparable harm existed. 553 F.2d at 300; 520 F.Supp. at 793. In the case before me, the plaintiff is being deprived of an important right guaranteed by federal legislation. Even assuming that the denial alone might be compensated for by money damages, other injury flowing from the denial could not. Richard is a collegiate caliber football player who hopes that this talent will be his entre to college. Neither his grades, which

are average, nor his family's financial status offer as good an opportunity for him to attend college as does his athletic ability in this sport. Whether such an opportunity will materialize depends upon his having a chance to play his senior year. Even then, much will depend on his performance and other intangibles. It would be nearly impossible for him if he is denied the opportunity to play, to prove later, with the degree of certainty required for an award of money damages, the existence of a loss and its value.

Finally, I conclude that no injury is likely to result to the defendant or the public interest by granting this relief. The plaintiffs are willing to take responsibility for the decision that they have reached. The only credible medical opinion, Dr. Moyer's, shows that the likelihood of the type of injury that concerns the defendant is almost nil. Finally, the public interest is served when plaintiffs such as these vindicate important federal rights.

For the reasons stated above, the motion for preliminary injunction will be granted. My conclusions of law and an appropriate order follows.

*Conclusions of Law*

1. Richard is a handicapped individual within the meaning of the Act. *See* 29 U.S.C. § 706(7).

2. As a recipient of federal funds, the defendant is subject to the requirements of § 504. *See* 29 U.S.C. § 794.

3. Richard is "otherwise qualified" as that language is used in the Act.

4. The defendant's refusal to permit him to participate on the football team lacks substantial justification.

5. The plaintiffs have made a strong showing of likelihood of success on the merits.

6. The plaintiffs have demonstrated irreparable harm.

7. No substantial harm is likely to result to the defendant.

8. The public interest will not be harmed by granting the relief.

ORDER

NOW, October 6, 1982, upon consideration of the plaintiffs' motion for preliminary injunction, memoranda and proposed findings and conclusions submitted by the parties, following a hearing held in open court, and for the reasons stated in the accompanying memorandum, IT IS ORDERED that

1. The motion is GRANTED.

2. THE DEFENDANT IS PRELIMINARILY ENJOINED FROM PRECLUDING THE PLAINTIFF RICHARD WILLIAM GRUBE FROM PARTICIPATING AS A MEMBER OF THE FREEDOM HIGH SCHOOL FOOTBALL TEAM ON THE SAME TERMS AND CONDITIONS AS APPLY TO ALL OTHER MEMBERS OF THE TEAM.

3. THE PLAINTIFFS SHALL GIVE SECURITY IN THE SUM OF $1,000.00.